# No. 24-13113-G

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff/appellee,*

v.

GUERBY RENE,

*Defendant/appellant.*

On Appeal from the United States District Court
for the Southern District of Florida

APPELLANT'S INITIAL BRIEF

RICHARD C. KLUGH, ESQ.
Counsel for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Tel. No. (305) 536-1191

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

## United States v. Guerby Rene, Case No. 24-13113-G

Appellant, Guerby Rene, files this Certificate of Interested Persons and Corporate Disclosure Statement, in this appeal, as required by 11th Cir. R. 26.1.

Damian, Hon. Melissa

Forand, Peter

Goodman, Hon. Jonathan

Klugh, Richard C.

Lapointe, Markenzy

Louis, Hon. Lauren Fleischer

Martinez, Hon. Jose E.

Matzkin, Daniel

Miranda, Annika Marie

Napoleon, II, Hilton

Rene, Guerby

Rosenzweig, Will J.

Rubin, Eli

Sanchez, Hon. Eduardo I.

Small Business Association (SBA)

Srebnick, Howard Milton

Strauss, Hon. Jared M.

# STATEMENT REGARDING ORAL ARGUMENT

The defendant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision making process.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . C1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Course of Proceedings and Disposition Below . . . . . . . . . . . . . . . . . . . . . 4

      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT AND CITATIONS OF AUTHORITY . . . . . . . . . . . . . . . . . . . . . . 12

I.     The government's case relied on a deficient fraud theory that failed to prove material misrepresentations or an intent to harm the SBA; there was thus insufficient evidence to sustain the verdict . . . . . . . . . . . . . . . . . 12

     A.    With respect to all counts, the government failed to produce sufficient evidence and relied on deficient fraud theories, thus failing to meet its burden . . . . . . . . . . . . . . . . . . . . . . 14

B. The government failed to offer substantial evidence that Rene was guilty of Count 1 of the Indictment, relating to the 365Live loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C. The government failed to introduce substantial evidence of guilt of Count 2 of the Indictment, charging wire fraud with respect to the Excel Booking Loan Application . . . . . . . . . . . 25

D. The government failed to prove the allegations charged in Count 3 of the Indictment, with respect to the Excel Booking Loan Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II. The district court erred in allowing Rene's entire immigration file to be introduced into evidence; this error violated Rene's due process rights and amounted to a constructive amendment of the Indictment, warranting reversal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

III. The district court erred in failing to grant a continuance, and this error affected the defendant's fundamental rights, warranting reversal . . . . . . . 31

IV. The district court erred in excluding highly relevant and exculpatory defense evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

V. Cumulative error warrants vacatur of the conviction . . . . . . . . . . . . . . . . . 39

A. Improper closing argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

iii

B.   Improper testimony from Case Agent Olson. . . . . . . . . . . . . . . . . . . 43

C.   Absence of a Unanimity Instruction . . . . . . . . . . . . . . . . . . . . . . . . . 44

VI.   The district court erred in calculating the sentencing guidelines . . . . . . . . 48

A.   Obstruction of justice enhancement . . . . . . . . . . . . . . . . . . . . . . . . 48

B.   Loss calculation.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**CASES**:

*Brady v, Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 32, 33

*Bronston v. United States*, 409 U.S. 352 (1973) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Burks v. United States*, 437 U.S. 1 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Chambers v. Mississippi*, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . 39

*Davis v. Zant*, 36 F.3d 1538 (11th Cir.1994) . . . . . . . . . . . . . . . . . . . . 41

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . 40

*Gandy v. Alabama*, 569 F.2d 1318 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . 33

*Hutchins v. Wainwright*, 715 F.2d 512 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . 44

*Jones v. State*, 449 So.2d 313 (Fla. 5th Cir. DCA 1984) . . . . . . . . . . . . . . . . . . 41

*Kisor v. Wilkie*, 588 U.S. 558 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004) . . . . . . . . . . . 9

*Kousisis v. United States*, No. 23-909, 144 S. Ct. 2655 (2024). . . . . . . . . . . . . . . 16

*Long v. Raymond Corp.*, 245 Fed.Appx. 912 (11th Cir. 2007) . . . . . . . . . . . . . . . . 9

*United States v. Adkinson*, 158 F.3d 1147 (11th Cir. 1988) . . . . . . . . . . . . . . . . 13

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . 33, 39, 40

*United States v. Baptista Rodriguez*, 17 F.3d 1354 (11th Cir. 1994) . . . . . . . . . . 37

*United States v. Calle*, 822 F.2d 1016 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . 39

*United States v. Campa*, 459 F.3d 1121 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 9

*United States v. Cannon*, 41 F.3d 1462 (11th Cir. 1995) . . . . . . . . . . . . . . . . . 20

*United States v. Carrasco*, 381 F.3d 1237 (11th Cir. 2004) . . . . . . . . . . . . . . . 9

*United States v. Ciminelli*, 598 U.S. 306 (2023) . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Diamond*, 102 F.4th 1347 (11th Cir. 2024) . . . . . . . . . . . . . . . . 9

*United States v. Dohan*, 508 F.3d 989 (11th Cir. 2007) . . . . . . . . . . . . . . . . . 10

*United States v. Dunnigan*, 507 U.S. 87 (1993) . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Elbeblawy*, 899 F.3d 925 (11th Cir. 2018) . . . . . . . . . . . . . . . 29

*United States v. Epps*, 613 F.3d 1093 (11th Cir. 2010) . . . . . . . . . . . . . . . . . 44

*United States v. Eyster*, 948 F.2d 1196 (11th Cir. 1991) . . . . . . . . . . . . . . . 43, 44

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (en banc) . . . . . . . . . . . 9

*United States v. Grow*, 977 F.3d 1310 (11th Cir. 2020) . . . . . . . . . . . . . . . . . 47

*United States v. Hawkins*, 934 F.3d 1251 (11th Cir. 2019) . . . . . . . . . . . . . . . 47

*United States v. Hines*, 955 F.2d 1449 (11th Cir. 1992) . . . . . . . . . . . . . . . . . 31

*United States v. Hurn*, 368 F.3d 1359 (11th Cir. 2004) . . . . . . . . . . . . . . . . . 38

*United States v. Jeri*, 869 F.3d 1247 (11th Cir. 2017) . . . . . . . . . . . . . . . . . 33

*United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006) . . . . . . . . . . . . . . . . . 48

*United States v. Keller*, 916 F.2d 628 (11th Cir. 1990) . . . . . . . . . . . . . . . . . 29

*United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989) . . . . . . . . . . . . . . . . . 13

*United States v. Ladson*, 643 F.3d 1335 (11th Cir. 2011) . . . . . . . . . . . . . . . . 40

*United States v. Madden*, 733 F.3d 1314 (11th Cir. 2013) . . . . . . . . . . . . . . . . . . 29

*United States v. Manapat*, 928 F.2d 1097 (11th Cir. 1991). . . . . . . . . . . . . . . . 20

*United States v. McCarrick*, 294 F.3d 1286 (11th Cir. 2002) . . . . . . . . . . . . . . 18

*United States v. Mitrovic*, 890 F.3d 1217 (11th Cir. 2018) . . . . . . . . . . . . . . . . 39

*United States v. Moran*, 788 F.3d 942 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . 9

*United States v. Pearson*, 746 F.2d 787 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . 43

*United States v. Rogers*, 981 F.2d 497 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . 40

*United States v. Russell*, 957 F.3d 1249 (11th Cir. 2020) . . . . . . . . . . . . . . . . . . 39

*United States v. Shotts*, 145 F.3d 1289 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . 19

*United States v. Simon*, 964 F.2d 1082 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . 42

*United States v. Sorondo*, 845 F.2d 945 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . 30

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) . . . . . . . . 12, 14, 15, 16

*United States v. Villegas*, 911 F.2d 623 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . 13

*United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) . . . . . . . . . . . . . . . 13

*Vines v. Jones*, 2015 WL 6693238 (N.D. Fla. Oct. 2, 2015),

    *adopted*, 2015 WL 6680875 (N.D. Fla. Nov. 2, 2015) . . . . . . . . . . . . . . . . 41

*Wooden v. United States*, 142 S. Ct. 1063 (2022) . . . . . . . . . . . . . . . . . . . . . . . 19

*Yates v. United States*, 354 U.S. 298 (1957) . . . . . . . . . . . . . . . . . . . . . . . . 14, 30

**STATUTORY AND OTHER AUTHORITIES**:

U.S. Const., amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 30, 34, 39

U.S. Const., amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 33, 34, 39

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

18 U.S.C. § 1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 9

Fed. R. Crim. P. 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37, 38

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231, because the defendant was charged with offenses against the laws of the United States. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which gives the courts of appeals jurisdiction over all final decisions of the district courts of the United States, and 18 U.S.C. § 3742(a), which authorizes the defendant's appeal of her sentence. The notice of appeal, DE:118, was timely filed on September 23, 2024, from the final judgment, DE:117, which was entered on September 19, 2024.

**STATEMENT OF THE ISSUES**

I.      Whether there was sufficient evidence to sustain the verdict as to wire fraud arising from federal loan applications where the government: relied on deficient fraud theories, failed to introduce the loan application form, and failed to prove the material falsity of statements made on the loan applications, including as to Count 3's allegation that Rene never submitted a tax return to the IRS when the government conceded at trial that Rene's company, for which the loan was sought, in fact had done so.

II.     Whether the conviction should be reversed where: (A) the government constructively amended the Indictment by suggesting jurors could convict on the basis that Rene indicated he was a U.S. citizen despite the fact he is a legal permanent resident who was eligible to receive the loans at issue, and (B) the district court erred in allowing the government to introduce Rene's entire immigration file to support that amended theory, thereby prejudicing Rene and substantially confusing the issues for the jury.

III.    Whether vacatur is required because the district court erred in denying the defense request for a continuance after the government, on the eve of trial and during trial, produced over a thousand more documents, including *Brady* material, thereby violating Rene's Fifth and Sixth Amendment rights.

IV.     Whether the district court erred in excluding key exculpatory defense evidence based on a purported discovery violation when the defense made the records available for inspection well ahead of trial but could not provide physical copies in a timely fashion; and, relatedly, whether the district court erred in reading the discovery rules to require production of physical copies rather than making them available for inspection.

V.     Whether cumulative error at trial—including improper government closing argument, improper testimony from the government's case agent, and the lack of a unanimity instruction—warrants reversal.

VI.     Whether the district court erred in calculating the sentencing guidelines where: (A) the loss calculation was erroneously set on the basis of speculation about intent rather than actual loss; and (B) the imposition of an obstruction of justice enhancement was unsupported by the record and the relevant timeline.

## STATEMENT OF THE CASE

### Introduction

Guerby Rene lawfully came to this country at age 12 and later obtained legal permanent residency. He started, and paid taxes on, two successful small businesses in the entertainment, promotional, and live events industries. When the pandemic hit, he—like many American entrepreneurs—applied for loans under the Economic Injury Disaster Loan program (loans he subsequently repaid in full, *see* DE:122:40), in order to keep his businesses afloat. Notwithstanding the acute challenges the pandemic posed, he used those loans not just to keep his head above water, but to make his businesses better. The government indicted Rene based on the loan applications and expenditures, including arguing that the loan funds could be used only to recover lost business, not build up the business.

Rene maintained his innocence and went to trial. He challenges on appeal the sufficiency of the evidence of federal fraud violations. He further contends that reversal is required based on the denial of the right to effectively present a complete defense concerning his businesses and tax compliance and showing the government's inadequate, skewed investigation. Rene's trial rights unfairly suffered from the government's use of improper fraud theories, including allegations later shown to be false, and improper use Rene's immigration status as a focus of the case. Rene's

Sixth Amendment right to effective assistance of counsel was infringed by the district court's refusal to grant a continuance after the government belatedly produced hundreds of pages of discovery, including favorable evidence, on the eve of and during trial. And Rene's own defense was cut off due to the district court's incorrect interpretation of the discovery rules. The jury, barraged with irrelevant, highly prejudicial evidence and arguments regarding fraud, convicted Rene of wire fraud, acquitting him of all money laundering charges. His convictions and sentence should be reversed.

### Course of Proceedings and Disposition Below

On January 25, 2024, Guerby Rene was charged in a five-count federal indictment filed in Miami. Counts 1–3 alleged Rene committed wire fraud, under 18 U.S.C. § 1343, in applying for SBA loans. Counts 4 and 5 alleged money laundering, under 18 U.S.C. § 1957, in the use of loan proceeds to make expenditures of over $10,000. Rene proceeded to trial. The jury acquitted him of the money laundering charges, but convicted him of the three wire fraud counts, and on September 18, 2024, the district court sentenced Rene to 37 months' imprisonment. DE:117.

### Statement of Facts

At trial, the government presented the results of its investigation into whether Rene made false material statements in applying for SBA loans. DE:88:121, *et seq*. The loans—which were issued as part of the Economic Injury Disaster Loan (EIDL)

4

program, which provided loan assistance for small businesses, DE:88:196-97, 200—were for two Miami businesses wholly owned by Rene: 365Live Inc., formally incorporated August 5, 2019; and Excel Booking Inc., formally incorporated December 13, 2019. DE:88:136. 365Live held a corporate bank account at JPMorgan Chase; and Excel Booking held a separate corporate bank account at Wells Fargo. DE:89:114-15, 126.

The first loan application (Count 1) was submitted by Rene on behalf of his 365Live business—an event management company that arranged for entertainment and performance events principally in the Miami area, DE:89:202—on June 24, 2020. DE:88:150. The amount of the loan was $87,500. DE:88:123. In the application, there was a certification that all information provided by the applicant was true and correct and that the applicant would "use all the proceeds of this loan solely as working capital to alleviate economic injury caused by disaster occurring the month of January 31, 2020, and continuing thereafter." DE:87:215.

On June 30, 2020, Excel Booking, through Rene, applied for $150,000 loan (Count 2). Excel Booking was engaged in "rentals for yachts, houses, expensive cars, and things of that nature." DE:90:5. SBA approved the loan and deposited approximately $149,900 in loan proceeds into the Excel Booking account. DE:89:56.

On April 8, 2022, Rene submitted an application to the SBA to modify Excel Booking's EIDL loan agreement (Count 3). DE:88:29. As part of the application,

Rene submitted 2019 and 2020 federal business tax returns that had been sent to the IRS by his tax preparer. The government did not dispute that those taxes were timely paid, but alleged that the returns themselves were not submitted to the IRS. At trial, after realizing that at least one of the returns had been submitted to the IRS but then rejected, the government focused on the distinction between "submitted" and "filed," notwithstanding the fact that it had charged in the Indictment that Rene never *submitted* the tax returns. DE:89:9.

The principal theory offered by the government, in support of the indicted allegations of false loan applications, was that Rene claimed revenue and operations pertaining to 365Live and Excel Booking for the year 2019 that was not supported by the government's review of bank, tax-filing, and business incorporation records. The government's key claim was that because 365Live and Excel Booking were not incorporated until late 2019, they could not have been operative businesses in 2019. *See* DE:90:102 (Homeland Security agent Ashley Olson testifies that she did not "believe that there was an active business for 365Live or Excel Booking in 2019 or early 2020," and thus concluded that "subpoenaing the defendant's businesses [would not] have given [her] records for companies that didn't have active operations."). *See also* DE:89:196 (case agent Olson conceding she never did internet research on the company to see if it threw parties, hosted events, or had a website).

The government offered testimony that the bank accounts separately

established for Excel Booking and 365Live—*in January 2020, see* DE:90:103—did not have sufficient deposits or expenditures to match information stated in the loan application regarding business conducted by Rene in *the prior year, 2019. Id.* Agent Olson testified to a "nonexistence of other bank or business records that [she] could get for the relevant time period." *Id.* However, the government took no steps to determine whether additional bank accounts that were not in the name of 365Live or Excel Booking, but which were used by Rene for business purposes and which had revenue consistent with the loan applications, were transacting funds in 2019 that pertained to the businesses that received the loans. (The government's late production, just days before trial, of those additional bank records was the primary subject of a motion for continuance made by Rene at the commencement of trial. *See* DE:87:3.)

The government thus offered no actual reconstruction of business activity by 365Live or Excel Booking, instead relying on the absence of the more formal indicia of the bank records for the corporations. Pursuing this negative form of formal investigation, Agent Olson did not investigate whether Rene had paid income taxes for 365Live and Excel Booking, resting her entire tax investigation on invalid information from the IRS as to whether returns for the companies were filed (a distinct issue from whether the taxes were paid, and a distinct issue from whether the tax returns were *submitted*, which was the language alleged in the Indictment).

DE:90:98.

The government also offered evidence in an unsuccessful effort to prove the money laundering charges. As to Count 4, the government showed that Rene temporarily *leased* an expensive, showy foreign car which was then wrapped in 365Live advertising—again, he promoted his business in the live events industry in Miami. The government contended that using the loan proceeds for this purpose constituted a § 1957 violation. The jury rejected that contention, along with the government's Count 5 contention that tax payments made by Rene had derived from loan proceeds. DE:62.

The government also introduced, over objection, Rene's entire immigration file, ostensibly for the purpose of demonstrating that he is a lawful permanent resident (possessing a green card), rather than a U.S. citizen. DE:88:102-03. Legal permanent residents, too, are eligible for EIDL loans. DE:89:191. Other documents in the immigration file implicated Rene in an unrelated alleged crime of which he was never charged and contained adverse opinions of him by an immigration judge. DE:88:114.

The government also introduced evidence that funds from the bank accounts into which SBA loan proceeds were deposited were used to pay personal taxes, lease a showy automobile that was wrapped entirely to advertise his 365Live business, make payments on a personal credit card bill, and to move $127,000 out of the Excel

8

Booking account while closing it down and placing the funds in his personal bank account.  As noted, however, the jury rejected the government's contention that Rene committed the charged § 1957 offenses.

At sentencing, the district court overruled Rene's objections to the loss calculation and imposed, over objection, an obstruction-of-justice enhancement premised on Rene's efforts to present at trial tax filings his former tax preparer had—years earlier, contemporaneously with Rene's payment of the relevant income taxes—forwarded to Rene to confirm that the returns were properly filed with IRS.

**Standard of Review**

This Court reviews challenges to the sufficiency of the evidence *de novo*. *United States v. Diamond*, 102 F.4th 1347, 1353 (11th Cir. 2024).  A district court's interpretation of the Federal Rules of Criminal Procedure is reviewed *de novo*, *United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006), as are interpretations of the Federal Rules of Evidence.  *Long v. Raymond Corp.*, 245 Fed.Appx. 912, 913 (11th Cir. 2007).   More generally, review of trial errors, including instructional and evidentiary and closing argument improprieties, is for abuse of discretion.  *United States v. Carrasco*, 381 F.3d 1237, 1242 (11th Cir. 2004) (instructional); *United States v. Frazier*, 387 F.3d 1244, 1276 (11th Cir. 2004) (en banc)(evidentiary); *United States v. Moran*, 788 F.3d 942, 969 (11th Cir. 2015) (closing argument).  *See also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) (abuse of discretion

9

where district court "applies an incorrect legal standard, follows improper procedures in making the determination," "makes findings of fact that are clearly erroneous," or "appl[ies] the law in an unreasonable or incorrect manner"). In reviewing cumulative error, the total prejudicial effect of the trial errors, both preserved and plain, must be weighed *de novo*. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007).

## SUMMARY OF THE ARGUMENT

The government failed to prove that Rene was guilty of wire fraud. Proceeding on a deficient fraud theory that failed to prove the knowing and material falsity of any statements and failed to introduce into evidence the actual digital form that an applicant would have filled out, the government erroneously suggested to the jury that any technical inaccuracies were sufficient to prove an intent to defraud the SBA. The government improperly suggested that if Rene used the loans for any purpose other than its narrow view of *alleviation*—that is, to bring the business back to square one—then that was proof of wire fraud.

After learning mid-trial the incorrect nature of *one of its own allegations*—that Rene's company "never submitted any such tax form to the IRS," DE:1, the government did not acknowledge it was wrong. Instead, it doubled down and took the position that the returns submitted to the IRS (reflecting business taxes that Rene actually paid) were never *filed* with the IRS (because they were rejected), and thus somehow his submission of records reflecting taxes he paid was fraudulent. The

government subsequently elicited testimony to create an impression to the jury that the returns were falsified, even though the government had no evidence that Rene knew when he submitted the returns, that they were rejected due to tax preparer error. The defense was limited in its ability to tell the jury the full story because the district court excluded crucial defense evidence and repeatedly cut off cross-examination.

The government also bombarded the jury with evidence, testimony, and arguments about the fact that Rene—without an option to select legal permanent resident—indicated on his application that he was a United States citizen. Permanent residents too are eligible for loans, so any inaccuracy in this respect was entirely immaterial and was not charged. The government was permitted over objection to introduce Rene's entire immigration file to support this theory—distracting the jury, muddying the issues, and creating a highly prejudicial sideshow.

The district court also erred in failing to grant the defense request for continuance after the government belatedly produced discovery, including *Brady v, Maryland*, 373 U.S. 83 (1963), material. This violated Rene's due process rights and fettered the defense. This error was made worse by the district court's exclusion of key defense evidence, based on a misreading of the discovery rules to require production to the government of physical copies rather than simply inspection. Finally, the cumulative trial error warrants vacatur.

11

The district court erred at sentencing by imposing a factually unproven, logically defective obstruction-of-justice enhancement premised on actions of Rene's former tax preparer who had been terminated long before Rene ever became aware of any criminal investigation. The government's theory of obstruction made no sense where Rene, who had paid his businesses' income taxes at the time that his tax preparer advised him the returns were filed, was unaware of any errors in the filing process. The district court also erred in overruling Rene's objections to a loss calculation that far exceeded any theory of actual loss, rested on speculation as to Rene's likelihood of payment, and constituted a form of intended-loss reliance that does not apply to Rene's September 2024 sentencing, when the guideline did not include intended loss.

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.     There was insufficient evidence to sustain the verdict where the government relied on a deficient fraud theory that failed to prove material misrepresentations or an intent to harm the SBA.**

Defendant Rene's convictions for wire fraud are infirm where the government failed to prove that he made material misrepresentations on his application for an EIDL loan and failed to prove, as it must, that he intended to harm to the SBA or that the SBA was denied the benefit of the bargain. *See United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). The SBA suffered no economic loss as a result of the

12

loans in this case, which were extended to legitimate operating companies and which were used to improve the businesses. The government failed to show that any technical inaccuracies on loan applications deprived the SBA the benefit of its bargain.

Evidence of guilt must be substantial, and if the record reveals a lack of substantial evidence from which a fact-finder could find guilt beyond a reasonable doubt, this Court will reverse the conviction. *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989). Evidence is insufficient where it is "wholly consistent with an obvious and reasonable innocent interpretation, and where little more than conjecture supports the hypothesis of guilt." *Id*. A verdict cannot rest on an uncertain foundation, *id.*, and this principle holds particular weight in cases involving an alleged misstatement on a government form. *See, e.g., United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) (reversing health care false statement conviction where regulations and administrative authority did not "clearly answer" the dispositive elemental question regarding reporting of information). Inferences are made in the government's favor, but must be reasonable; evidentiary theories premised on speculation must be discounted. *See United States v. Adkinson*, 158 F.3d 1147, 1152-64 (11th Cir. 1988) (inferences must be reasonable and cannot be mere speculation); *United States v. Villegas*, 911 F.2d 623, 628-31 (11th Cir. 1990) (must be more than mere possibility). Meanwhile, "[w]here the verdict is supportable on one ground, but

13

not on another, and it is impossible to tell which ground the jury selected, the verdict must be set aside." *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).

### A. With respect to all counts, the government failed to produce sufficient evidence and relied on deficient fraud theories, thus failing to meet its burden.

Defendant Rene was convicted of three substantive counts of wire fraud, each relating to a separate loan application. The government alleged that Rene made false statements on a digital application, and that those false statements were *per se* fraud—but the government at trial never produced the relevant form, nor did it produce the accompanying instructions that an applicant would have viewed when filling out the form. *See* DE 87:207 (testimony from SBA witness: "Well, like I said, this isn't actually what the applicant saw on the computer screen when they were filling it out"). The jury was left to merely speculate about the user experience—resulting in a fundamental missing link in the chain of evidence required to sustain a verdict.

The government's theories of fraud were also insufficient. "The wire fraud statute, 18 U.S.C. § 1343, does not enact as federal law the Ninth Commandment given to Moses on Sinai." *United States v. Takhalov*, 827 F.3d 1307, 1310 (11th Cir. 2016) (citing *Exodus* 20:16). It "forbids only schemes to *defraud*, not schemes to do

14

other wicked things, e.g., schemes to lie, trick, or otherwise deceive." *Id*. Rene was not charged with making false statements, in violation of 18 U.S.C. § 1001; he was charged with wire fraud.

*Takhalov* instructs that "a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick." *Takhalov*, 827 F.3d at 1313. "And this is so even if the transaction would not have occurred but for the trick." *Id*. "For if there is no intent to harm, there can only be a scheme to *deceive*, not a scheme to *defraud*." *Id*. The government introduced no evidence of any intent to harm the SBA.

Nor did the government prove any material misrepresentations. Instead, the government took the position that *everything* on the loan applications was material; that everything needed to be truthful, and that any inaccuracies on the applications violated the statute because "[t]he SBA, during a global pandemic, is relying on you to tell the truth." DE 92:16. *See also* DE 92:26 (government suggesting in closing that the jury could convict based on "lying about simple facts"; and because the defendant did not "call[ ] to clarify if he's answering truthfully" the questions on the form).

The government's sweeping, regulatory-driven theory of the case—that any technical noncompliance, no matter how minute, is a material misrepresentation

sufficient to prove wire fraud—is fundamentally inconsistent with *Takhalov*. Regulatory noncompliance is not sufficient evidence of a scheme to defraud. Economic harm must be the object of the loan acquisition, and the misrepresentation must go to the heart of the bargain.

The government never proved that Rene did not qualify for the loans. And the SBA received the benefit of its bargain; the purpose of the program was to pump money into the economy through small businesses. Rene operated the legitimate and active small businesses for which he sought loans, and he used the funds in furtherance of those businesses (as reflected by the jury's acquittal of all money laundering charges alleged in Counts 4-6 of the Indictment). Whatever administrative or contract violation may otherwise be at issue with any non-compliance with the SBA requirements, economic harm was not the object of the loan acquisition. The government's fraudulent inducement theory was insufficient.[1]

There was no evidence of any intention to cause economic injury. Rene

---

[1]The fraudulent inducement theory grounding the convictions, which has been prohibited in this Circuit since *Takhalov*, is central to the Supreme Court's pending decision in *Kousisis v. United States*, No. 23-909, 144 S. Ct. 2655 (2024). The Solicitor General has argued that if petitioners there prevail, the *Takhalov* rule will become the law everywhere, and the statute will "not criminalize schemes to fraudulently induce a victim into agreeing to pay for property or services so long as, at the end of the transaction, the victim has not suffered a net pecuniary loss." *Kousisis v. United States*, No. 23-909, U.S. Br. at 20.

remained at all times solvent and able to back the loan repayment. The government's reference to a single mailed notice indicating payment was due in January of 2023, followed by a series of robo-calls that even the government's case agent conceded "could also go to spam," *see* DE 88:70, did not supply substantial evidence of guilt that Rene—who correctly identified extensive assets—intended to fail to repay whatever he owed on the loans. The government never proved anything to the effect that Rene intended, at the time of applying for the loan (that is, when the fraud was charged to have occurred), to not repay the loans. The evidence clearly demonstrated that Rene continued to maintain the viability of the businesses that took out the loans.

The government also proceeded on a loan diversion theory that cannot sustain the verdict for several reasons. The government argued that Rene's use of the loan funds—towards his small businesses—were somehow inconsistent with what the government believed to be the only permissible use: to put the business back in its pre-COVID state, but to make it no better than that. First, even if the government's loan diversion theory was internally contradictory with the two money laundering counts charged in the Indictment, in that both of those expenditures could be used as needed to maintain promotion of and tax compliance by the businesses.

Second, the loan diversion theory itself was deficient in that it advanced a right-to-control theory rejected by *United States v. Ciminelli*, 598 U.S. 306, 316-17 (2023)

(right-to-control theory invalid; noting that it "vastly expands federal jurisdiction without statutory authorization" by "mak[ing] a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law"). *See also United States v. McCarrick*, 294 F.3d 1286, 1292 (11th Cir. 2002) ("[T]he fact that McCarrick canceled the paint booth only four weeks after it was ordered . . . does not provide a sufficient basis, on this record, for the inference that he did not intend to buy it in the first place").

To advance this purported "loan diversion" theory, the government adopted an unworkably narrow reading of the statute and of the EIDL loan terms, one built on the faulty premise that loan funds can only be used to *alleviate*, but not to improve. *See, e.g.,* DE:92:17 (government arguing that "[t]he borrower is required to use the proceeds solely as working capital to alleviate economic injury caused by COVID. It's not to start a new business. It's not to pursue an idea.").

The government's theory thus rendered the case the worst kind of regulatory prosecution, aimed at strangling any successful business endeavors that were at all facilitated by the extension of a pandemic loan. Not only is this inconsistent with the public policy behind the loan program (i.e., the SBA's benefit of the bargain); it is also inconsistent with the statute, which cannot be used to advance this tortured view of economic stimulus programs by criminalizing ventures whose success is at all

18

facilitated by a loan. This distorted theory of fraud was predicated on inaccuracies: the government admitted that Rene's businesses existed before the loans, making claims that funds were used to "start a new business" misplaced, and thus insufficient.

There were also constitutional problems with this theory: the statute does not supply fair notice that using a pandemic loan to improve a business, rather than to simply bring it back to its pre-pandemic status, could violate the law. "[A]ny reasonable doubt about the application of a penal law must be resolved in favor of liberty." *Wooden v. United States*, 142 S. Ct. 1063, 1082-81 (2022) (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws.").

Particularly in light of the ambiguity of the applicable forms—and the technical, legal meanings of terms used—there was no basis for the conviction of the three substantive wire fraud counts. The government failed to prove the knowing or material falsity of any of the misrepresentations charged in the Indictment. *See United States v. Shotts*, 145 F.3d 1289, 1297-99 (11th Cir. 1998) (perjury not proven where testimony was literally true; defendant's denial of being "owner" of business was "literally true" under Alabama law, even though he controlled company through nominal owners; a "perjury conviction under 18 U.S.C. § 1621 cannot be based upon a statement, however misleading or incomplete, that is the 'literal truth.' *Bronston v.*

*United States*, 409 U.S. 352 (1973).")  *See also id.* at 1297 ("An answer to a question may be non-responsive, or may be subject to conflicting interpretations, or may even be false by implication.  Nevertheless, if the answer is literally true, it is not perjury."); *United States v. Manapat*, 928 F.2d 1097 (11th Cir. 1991) (where basis for § 1001 prosecution was alleged false statement on governmental form, inherent ambiguities barred conviction); *United States v. Cannon*, 41 F.3d 1462, 1468-69 (11th Cir. 1995) (false statement conviction reversed where statement, on its face, not false; evidence showed the request on the form did not necessarily include the matter asserted by the government).

B. **The government failed to offer substantial evidence that Rene was guilty of Count 1 of the Indictment, relating to the 365Live loan.**

Count 1 of the Indictment charged that, in submitting an EIDL application for his 365Live business, Rene made four misstatements, relating to (1) the company's gross revenue for the twelve months prior to the start of the COVID-19 pandemic; (2) the number of employees; (3) the date the company was established; and (4) that Rene would "use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020."  DE 1.  The government failed to prove these false statements and failed to prove that any technical inaccuracies on the loan application were material misrepresentations.

### 1. *Revenues*

With respect to revenues, the government disputed the $220,000 revenue figure submitted on the loan application but failed to prove that this statement was false, much less materially so. The government never introduced evidence that the figure was lower than $220,000, but instead apparently adopted the position—though did not prove—that the correct revenue figure was zero. Its basis for that assumption relied on unduly narrow parameters for defining business activity and was predicated on the false notion that only transactions via a business account may be treated as business income or expense. These were single-shareholder companies; the government's position—that if business funds are placed in a non-company account of the sole owner, then no business revenue exists—was untenable. And the case was insufficiently investigated; the government failed to determine if business revenues existed in Rene's personal accounts; when they finally checked, they produced those bank records late, and then continued—even in the face of contrary evidence—to take the position at trial that no business revenues existed. The government's emphasis on purported noncompliance with rigid formalities governing business operation illustrates the regulatory nature of this prosecution but does not supply substantial evidence of guilt.

### 2. *Number of Employees*

The government failed to meet its burden with respect to the alleged falsehood

relating to number of employees. Notably, the evidence at trial revealed that the number of employees or independent contractors was *immaterial* to the loan amount, and only included on the application for purposes of a separate, uncharged advance. *See* DE 87:207 (SBA witness testifying that the question regarding number of employees was relevant not to the amount of the loan but rather to a different aspect of the loan program, not charged in the indictment, of "whether they wanted to be considered for an advance or not"). The application represented that 365Live had six employees—and evidence excluded by the district court would have proved that he indeed employed that many contractors. The burden is not on Rene to prove that the statement was true; it is on the government to prove the statement was false, and the government failed to carry that burden. Evidence is insufficient where it is "wholly consistent with an obvious and reasonable innocent interpretation, and where little more than conjecture supports the hypothesis of guilt." *Kelly*, 888 F.2d at 740. The government failed to offer any proof that 365Live did not employ six independent contractors, *see, e.g.,* DE 89:94 (government's IRS witness acknowledging that if 365Live hired contractors they would not be required to file a 941 tax form), and merely invited the jury to speculate that such workers were not on regular payroll. This speculation is insufficient, and the government failed to prove any misrepresentation, much less a material one.

### 3. *Date of Establishment*

The third purportedly false statement was that 365Live was established in 2015, but the government produced no evidence to dispute this date. The government focused instead on the date of formal *incorporation* and the contemporaneous opening of a corporate bank account. The government's SBA witness conceded that "you can establish a business before you incorporate it," and the application form asked for date of establishment, not date of incorporation. DE 88:53-54.[2]

Many businesses are never incorporated—a prime example being lawyers who operate without a corporation or LLC. It would be preposterous to tell a lawyer she is not yet in business because despite hanging out a shingle—or, as in Rene's case, a website and digital presence—she still has not incorporated. *Cf.* DE:92:14 (government arguing in closing that "a concept is not a company" and "an email address is not a company").

The government's unduly narrow and technical definition of "date of establishment," to mean only date of incorporation, failed to establish sufficient proof of a misrepresentation. Cross-examination of the government's case agent revealed how little investigation was done into the business. *See* DE:89:196 (case agent testifying that she never did "any internet research on 365Live"; never "looked to see

---

[2] As to numbers of employees, improperly excluded defense evidence established the material falsity of the government's argument. *See infra*.

if they had a website up"; never "looked to see if they threw parties or hosted events"; and generally had not done any internet research on 365Live).

In addition to failing to prove that the stated date of establishment was not true—that Rene created his business in 2015—the government failed to prove materiality. The date of incorporation was well before the pandemic, so even if the business had started closer to that date, any inaccuracy was immaterial.

### 4. *Use of Loan Proceeds to Alleviate Economic Woes*

As discussed above, in Part II.A, *supra*, the government's reliance on this "alleviate-economic-woes" theory—suggesting that pandemic loans could not be used to *improve* a business but only to bring it back to ground zero—was deficient as a matter of law, and inconsistent with a plain English understanding of the application provisions. The concept of alleviation is broad enough to encompass actions that help even a fledgling business. The government did not attempt at trial to prove that the pandemic did not impact the businesses. It instead proceeded on this theory that loan funds could not be used to help the business sustain *and grow* from its pre-COVID status. This interpretation exceeded the bounds of any reasonable reading of the application provisions. If the funds were used *in any sense* for the business, the funds were not diverted improperly, much less materially so.

**C.     The government failed to introduce substantial evidence of guilt of Count 2 of the Indictment, charging wire fraud with respect to the Excel Booking Loan Application.**

Count 2 of the Indictment charged misrepresentations as in Count 1—that the loan application falsely represented that (1) the company's gross revenue for the twelve months prior to the start of the COVID-19 pandemic was $375,000; (2) that the company had six employees; (3) that the company was established in 2018; and (4) that a box was checked certifying that the information was true and correct and that the applicant would "use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter." DE 1. The same reasons for finding insufficiency of the evidence as to Count 1 of the Indictment apply with full force to Count 2.

**D.     The government failed to prove the allegations charged in Count 3 of the Indictment, with respect to the Excel Booking Loan Modification.**

Count 3 charged one overarching misstatement, which the government failed to prove or failed to prove was material: that the revenues, employees, and business start date referenced in the Excel Booking application were "fraudulently recertified" in the loan modification. The Indictment made no allegation in Count 3 regarding the government's legally insufficient "alleviate-economic-woes" theory. Nor was the loan underlying Count 3 actually processed as to Count 3.

The same reasons for finding insufficiency as to Counts 1 and 2 also apply to Count 3. Count 3 also suffered from deficiencies regarding Rene's submission of tax returns to the Excel Booking EIDL loan modification. *See* DE:1:6.

### 1. *Business Tax Returns*

The government initially took the position that Rene did not submit business tax returns and that those submitted with his applications were fraudulent. The government learned mid-trial that Rene *had* submitted at least one of the business tax returns to the IRS, but it was rejected due to its being filed as an 1120-S rather than an 1120, *see* DE:89:9. Faced with this major deficiency on Count 3, the government tried to save face by saying that it was right all along—that although Rene had *submitted* a tax return to the IRS, *and actually paid the taxes reflected on that return* (and the other returns for the businesses), it wasn't technically "filed."

The government's emphasis on this distinction, and its suggestion that it was right in the first instance, was disingenous because the Indictment charged that "Excel booking never submitted any such tax form to the IRS." *See* DE:1:6. *Cf.* DE:89:9 (government saying, "It is regrettable that we just discovered this, but what the Government said was completely accurate. The defendant did not file tax returns. We learned this morning that he submitted one, and I made a disclosure immediately to the defense, so I just want to make that clear for the record."). *Cf.* DE:92:23 (government

26

then falsely argues in closing that tax return "was never submitted to the IRS"). What the government said was not "completely accurate"; by the government's own mid-trial admission, Rene had in fact submitted the tax return to the IRS. The fact that Rene's tax preparer had *submitted* at least one of the returns, and that Rene had *paid the taxes reflected in every return that he provided to the SBA*, demonstrates that his submission of the returns to the SBA was not a material misrepresentation.

The IRS witness did not know whether the notice of rejected return was sent to Rene or his tax preparer, *see* DE:89 at 89, and the government thus could not prove that Rene had any knowledge that the IRS did not accept his tax returns when he attached them to his SBA application. After this belated disclosure, the government continued to falsely accuse Rene of falsifying tax returns.

The line "Excel Booking never *submitted* any such tax form to the IRS," DE:1 (emphasis added), should have been stricken from the Indictment. That language, combined with the government's improper argument and questioning after learning the inaccuracy of its allegation, confused the jury and left it with the false impression that "Excel Booking never submitted any such tax form to the IRS." DE:1; DE:92:23 (government making same argument in closing after learning it was untrue). The prejudice from this was made worse by the fact that the district court repeatedly cut off the defense's cross-examination of the government's IRS witness, *see* DE:89:83,

91, 92.

**II.    The district court erred in allowing Rene's entire immigration file to be introduced into evidence; this error violated Rene's due process rights and amounted to a constructive amendment of the Indictment, warranting reversal.**

Notably missing from the Indictment was a charge that Rene committed wire fraud by falsely representing that he was a United States citizen.  Such a misrepresentation would not have been material because Rene, as a legal permanent resident, was eligible for a loan.  Rene's immigration status, however, became a feature of the trial, with the government repeatedly suggesting to the jury it could convict on the basis of a box checked on the forms indicating the applicant was a citizen.  Rene came to this country when he was 12, and there was no place on the application form to indicate permanent residency.  *See* DE:88:55.

This fails to satisfy the wire fraud materiality requirement; as the SBA witness said, "[P]art of the eligibility . . . is being here legally.  You're either a United States citizen *or you're a permanent resident* or some other legal immigration category."  *Id*. (emphasis added).  Rene fell into that broad category of eligibility; selection of "U.S. Citizen" thus was not a material falsity.

Repeatedly throughout trial, however, the government suggested that this was sufficient to convict, constructively amending the Indictment with an insufficient theory.  *See* DE 92:20, 26 (government arguing extensively in closing that Rene lied

28

about being a U.S. citizen, and that "proves he acted to defraud the United States Government" based on his "lying about simple facts, his citizenship,"). The citizenship issue was referenced repeatedly throughout the government's closing to burden-shift and to disparage the defendant. *See, e.g.,* DE 92:15-16 (apparently conceding the form was confusing by suggesting that Rene should have called the SBA to inquire "[h]ey, I'm not a citizen but I'm a legal permanent resident, how should I answer this question"); DE 92:57 (impermissibly arguing a propensity theory that the citizenship issue proves "the defendant is a liar," "that's what he does"); *id*. ("the truth is whatever he wants it to be in the moment").

"A defendant can be convicted only of a crime charged in the indictment." *United States v. Madden*, 733 F.3d 1314, 1318 (11th Cir. 2013). "[T]he government may not try a defendant on charges that are not made in the indictment against him." *United States v. Elbeblawy*, 899 F.3d 925, 937-38 (11th Cir. 2018). *See, e.g., United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990) (constructive amendment where government charged conspiracy between two individuals, but jury was permitted to convict as long as it found defendant agreed to commit crime with anyone).

The citizenship issue dominated the trial, and invited the jury to convict on the basis of an immaterial technical inaccuracy that was not charged in the Indictment and, even if charged, would be insufficient to sustain the verdict. "Where the verdict is

supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected, the verdict must be set aside." *Yates*, 354 U.S. at 312. *See* DE 92:60 (government in closing suggesting that U.S. citizenship issue was lie sufficient to convict, arguing that "[h]e's been found by an immigration judge to have previously lied to obtain a benefit using the same type of lie").

Making matters worse, the government was permitted at trial over defense objection to introduce Rene's *entire immigration file*, in violation of Fed. R. Evid. 403 and 404(b), and the due process clause of the Fifth Amendment. These records had no probative value and were offered as relevant to a purported false statement that was not material and was not charged. The prejudice was overwhelming, and the file served no permissible 404(b) purpose.

The use of this evidence and testimony violated Rene's due process rights. The use of immigration judge findings regarding false statements and other agency accusations also invaded the province of the jury and unfairly prejudiced Rene regarding the immaterial, uncharged citizenship provision of the application. The immigration matter related to a highly prejudicial issue of Rene's having voted mistakenly when he was just 18. DE:88:92-93, 97, 103, 107, 113. The findings or reports of an officer of the Justice Department constituted impermissible hearsay, improper opinion, and violated the rule of *United States v. Sorondo*, 845 F.2d 945

(11th Cir. 1988), regarding the use of other bodies' judgments to overwhelm the independent judgment of the jury regarding a prejudicial matter. *See also United States v. Hines*, 955 F.2d 1449, 1457 (11th Cir. 1992) (reversing convictions where government introduced mug shots showing defendants' interactions with law enforcement).

The problems resulting from the admission of this file cannot be isolated within a Fed. R. Evid. 403 or 404(b) analysis. The focus on citizenship undermines any sufficiency of the evidence as to other falsehoods charged: It was plainly immaterial, but due to the immense attention it received, there is a substantial risk that the jury concluded incorrectly that it could find Rene guilty based on the citizenship issue alone. This risk was magnified by the fact that the jury was instructed that "the government does not have to prove all the details alleged in the indictment about the precise nature and purpose of the scheme." DE:59:10. Additionally, there was no Rule 404(b) instruction with respect to the citizenship issue, nor with respect to the immigration file, substantially increasing the risk of conviction on an improper basis.

**III. The district court erred in failing to grant a continuance, and this error affected the defendant's fundamental rights, warranting reversal.**

Two days before trial the government produced tax and bank records that were essential to the defense. *See* DE:55 (outlining procedural history regarding belated production). The defense sought a brief continuance to verify documents, obtain

confirmatory witnesses, and consult with the defendant. The district court denied the continuance, suggesting that the defendant should have independently produced the records to counsel. *See* DE:87:6-7 ("It would be easier for him to get them than for the Government. He doesn't have to subpoena them."). This improperly placed the burden on the defendant to identify and to produce records that could be used against him, including records of closed bank accounts. The district court's reasoning imposed a pre-Indictment burden on the defendant to maintain records that could be used against him in a future prosecution. This placed an undue burden on the defense to anticipate what evidence the government might use, and unraveled the government's discovery and *Brady* obligations.

The prejudice resulting from the failure to grant a continuance is apparent in the government's erroneous assertion—at trial and in the PSI objections—that some documents were "falsified." *See* DE:85 (government's PSI objections). This highlights the difficulties that defense counsel faced in ensuring that the documents were handled correctly and presented accurate, complete information regarding the defendant's business activities.

The prejudice from the denial of a continuance was also exacerbated by the giving, over objection, of an instruction that the parties had equal access to evidence and witnesses. DE:91:66. Without the continuance and the time to prepare, the

defense's ability to marshal the appropriate financial witnesses caused an undue disadvantage to the defense. The prejudice was worsened by the government's burden-shifting remarks in closing. The failure to grant a continuance after the government produced hundreds of pages of records two days before trial—and an additional 900 pages of records the day before the calendar call—violated Rene's due process rights.

The failure to grant a continuance also violated Rene's Sixth Amendment right to counsel, a constitutional guarantee that includes "a sufficient time within which to prepare a defense." *United States v. Baker*, 432 F.3d 1189, 1248 (11th Cir. 2005) (quoting *Gandy v. Alabama*, 569 F.2d 1318, 1321 (5th Cir. 1978)). When determining whether counsel has been afforded sufficient time to prepare, courts must consider the "time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution." *United States v. Jeri*, 869 F.3d 1247, 1257 (11th Cir. 2017).

These factors illustrate the constitutional violation that occurred here. The defense had mere days to prepare. There was substantial prejudice because the belatedly produced records included *Brady* evidence essential to refuting the government's allegations. The accused did not play a role; the bank accounts had

been closed, making access difficult, and Rene was not aware that his returns were rejected. The prosecution did not make discovery available in a meaningful fashion. The district court's denial of the defense requests for continuances—first at calendar call and then again at trial—warrants vacatur.

## IV. The district court erred in excluding highly relevant and exculpatory defense evidence.

Notwithstanding its denial of the continuance based on the government's belated discovery production, the district court imposed a discovery sanction on the defense, excluding purportedly late-produced discovery. Substantial critical evidence supporting the defense of normal business operations by Rene—which revived as pandemic waned—as well as records of economic and financial activity by the defendant prior to obtaining SBA loans, was excluded as a sanction for a purported discovery violation under the Standing Discovery Order and Fed. R. Crim. P. 16. Exclusion substantially impaired the presentation of the defense and violated the defendant's fair trial and effective assistance rights under the Fifth and Sixth Amendments.

This sanction misapplied Rule 16. The government and the district court read Rule16 to require *physically turning over copies*, rather than just making evidence available for review—something the government does routinely with certain categories of evidence. The district court erred in reading the rules to require

exclusion if the defense only makes discovery available for inspection.

One month before trial, Rene provided counsel with a Dropbox link that contained his Skype messages; Rene used Skype to communicate with 7-8 individuals he employed to develop his website and mobile application for both businesses. DE:55:3. Defense counsel was not able to open the link, so Rene provided his login information. The messages revealed that Rene established his 365Live business in 2015 and Excel Booking shortly thereafter. The messages also showed a five-year history of Rene employing 1099 employees. DE:55:3. Upon discovering these messages, defense counsel "immediately informed the government via telephone of the content of the messages, Mr. Rene's intent on using them at trial, and undersigned counsel's difficulty opening the messages." *Id*. Defense counsel could not download the messages or convert them into a shareable file form, but invited government counsel to meet so that defense counsel could login directly to Rene's Skype account. Alternatively, defense counsel offered to set up a Zoom call. *Id*.

The government declined this invitation, and told undersigned counsel that he *had to physically provide the messages*. DE:55:3-4. This position is contrary to the text of Rule 16, which contemplates inspection but not physical production. Inspection is particularly appropriate where physical reproduction is unfeasible.

Between May 13 and May 24, 2024, the government produced to defense

35

counsel over 1,000 pages of documents to review. DE:55:4-5. On May 25, 2024, the government filed a motion to compel reciprocal discovery. DE:55:5. Defense counsel sent files downloaded from Rene's computer and again indicated that he did not have the right program to view the Skype records but invited government counsel to inspect them. Defense counsel then produced the raw data file on May 27, 2024. The government produced another 900 pages of documents on May 29, 2024, just days before trial. The district court denied the defense request for the continuance, and ruled that Rene could not introduce the Skype messages even though he had provided the government an opportunity to review them in early May. Again, contrary to the text of Rule 16 which contemplates only inspection, the district court found that Rene had to provide physical copies; at that point, the defense requested to provide 30-40 screenshots, and the district court excluded anything produced after the calendar call.

This reading of the discovery rules, and the resulting and incredibly harsh sanction imposed, violated Rene's fair trial rights. The discovery sanction was particularly severe because Rene was barred not merely from introducing evidence in his case-in-chief but also from using the evidence in cross-examination, including of the government's case agent. *See* DE:89:163, 215; DE:89:174 (exclusion of defense-offered crucial business record exhibits). Case Agent Olson offered conclusory opinions based on the government's investigation, and her testimony opened the door

36

to use of any evidence to show that the investigation and *opinions* were unfounded. *See, e.g.,* DE:88:125 (Agent Olson testifies that based on her investigation, the defendant's statements were false); DE:88:175-76, 179 (Agent Olson testifies that she discovered evidence that the defendant knew he was lying on a loan application).

Fed. R. Crim. P. 16 refers to evidence used in the case-in-chief, not in cross-examination. The discovery sanction here was impermissibly severe to the extent that it reached documents used for cross-examination. *See* DE:89:163, 215; *see also* DE:89:174 (exclusion of defense-offered crucial business record exhibits). This sanction amounted to a Confrontation Clause violation, because the defense was not permitted to meaningfully cross-examine the government's witnesses. *See, e.g., United States v. Baptista Rodriguez*, 17 F.3d 1354, 1365-68 (11th Cir. 1994) (reversing conviction as to codefendant based on preclusion of cross-examination regarding document significant to government's case; recognizing that the right of confrontation encompasses allowing a defendant to expose the jury to "facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he properly can argue why the witness is less than reliable."); *see id.* at 1370-71). The government had the burden and was trying to convince the jury that it thoroughly investigated; the defense was not even permitted to confront the case agent with business records that she did not review.

37

And the sanction was based on a non-violation. The defense provided the government *access to* and the *ability to inspect* all defense exhibits. *See* DE:55; DE:90:2. The government's declining to view the material in the only format in which the defense possessed it does not rise to a violation. *See* Fed. R. Crim. P. 16(b)(1)(A) ("defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if (i) the item is within the defendant's possession, custody, or control; and (ii) the defendant intends to use the item in the defendant's case-in-chief at trial"). The government's claim of a discovery violation was nothing more than the government's unwillingness to avail itself of the digital production.

The prejudice resulting from these violations was worsened by the government's closing argument, which allowed the jury to believe that defense counsel had lied in opening statement about the existence of exculpatory evidence, when instead its exclusion was based on an unfounded discovery objection and the government's refusal to review digital discovery. DE:91:54-55, 78-79 (government ridicules defense for mapping out anticipated evidence, when the government chose to take strong steps to keep out the evidence exculpatory to the defense). *See United States v. Hurn*, 368 F.3d 1359, 1363-67 (11th Cir. 2004) (listing categories of defense

38

evidence that cannot be excluded including evidence (1) directly relevant to the elements of the charged offense or affirmative defense; (2) of collateral matter that, through reasonable chain of inferences, could be relevant to elements or defense; (3) that could substantially impact credibility of significant government witnesses; or (4) that places government evidence in a significantly different light); *United States v. Russell*, 957 F.3d 1249, 1252-54 (11th Cir. 2020) (reversing conviction based on plain error in excluding exculpatory defense evidence); *United States v. Calle*, 822 F.2d 1016, 1020-21 (11th Cir. 1987) (reversing conviction based on district court's improper limitation of impeachment evidence). Such exclusion violates a defendant's Fifth and Sixth Amendment right to present witnesses and evidence that are relevant and favorable to the defense. *See generally Chambers v. Mississippi*, 410 U.S. 284, 294-98 (1973); *United States v. Mitrovic*, 890 F.3d 1217, 1221 (11th Cir. 2018) (discussing constitutional right to present a defense).

## V.     Cumulative error warrants vacatur of the conviction.

Cumulative error rendered Rene's trial unfair. The cumulative error doctrine protects a defendant from the prejudice of a multiplicity of errors upending the right to a fair trial, because "the cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005). The prejudice of cumulative errors thus may

require reversal, even if individual errors do not. *Id.* at 1203; *United States v. Ladson*, 643 F.3d 1335, 1342 (11th Cir. 2011) (same). This Court considers several factors, including "the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); the strength of the government's case, and the length of trial." *Baker*, 432 F.3d at 1223 (internal quotation marks and bracket omitted).

The multiple errors combined to result in substantial, pervasive prejudice; the errors were interrelated and whittled away at Rene's right to a fair trial. The totality of trial errors compels vacatur of the convictions. The errors include those discussed above, as well as:

**A.      Improper closing argument**.

A prosecutor's argument violates the Constitution if it renders the defendant's trial "so fundamentally unfair as to deny him due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974). "For a prosecutor's remarks to offend due process, the remarks must be improper and a reasonable probability must exist that, but for the offending remarks, the defendant would not have been convicted." *United States v. Rogers*, 981 F.2d 497, 499 (11th Cir. 1993). This Court has made clear that, in determining whether there is a reasonable probability that the outcome was changed, courts should consider the following criteria (1) the degree to which the challenged

remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they are deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused. *Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir.1994).

The government argued an impermissible propensity theory, telling the jury that "the defendant is a liar. That's what he does." DE:92:57. *See also* DE:92:58 (vouching for evidence and making improper propensity evidence telling the jury that "bank statements, unlike the defendant, don't lie"); *id*. ("corporate records, unlike the defendant, don't lie"); *id*. ("Whether a tax record is filed or not, according to IRS files, unlike the defendant, does not lie"); DE:92:23 (making improper propensity arguments that Mr. Rene "has no truth" and "will say whatever he believes will help himself"); DE:92:59 ("Those records come from the defendant because those are the numbers you can't trust."); *id*. ("the statements you can't trust are from the defendant"). *Cf. Jones v. State*, 449, So.2d 313, 314-15 (Fla. 5th Cir. DCA 1984) (cited in *Vines v. Jones*, 2015 WL 6693238, at \*23 (N.D. Fla. Oct. 2, 2015), *report and recommendation adopted*, 2015 WL 6680875 (N.D. Fla. Nov. 2, 2015)) ("where a case against a defendant is weak or tenuous, a prosecutor's contentions that the defendant is a liar could rarely, if ever, be construed as harmless error").

In closing argument, "[p]rosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury

might draw from it and the impermissible practice of arguing suggestions beyond the evidence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). "[P]rosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *Id*.

The government argued that "[i]f he's thriving as a businessman, why does he go back for over a million dollars more in emergency aid?  Why does he seek over a million dollars to alleviate the injury caused by the disaster?"  DE 92:20.  This suggested an improper presumption of guilt, inviting jurors to assume from the fact of the loan that the businesses did not have the money stated on the application.

The government continued burden-shifting by suggesting to the jury that Rene should have "call[ed] the SBA and sa[id], you know, I want to make sure I'm being honest.  I want to be truthful." DE:92:20.  The government opened its rebuttal closing by burden-shifting, arguing "I did not hear a lot about 2019 revenue; did you?  We saw a credit card application in the defendant's personal name in 2019.  That was the entire extent of defense counsel's presentation on the core issue in this case." DE:92:53; *id*. (district court overruling defense objection).  *See also* DE:92:54.  *See also* DE:92:56 ("here's another thing you didn't hear from Mr. Napoleon," and then improperly referencing immigration applications).  In reference to the *lease* of a flashy car which was *branded with company logos* (entirely wrapped as an advertising vehicle) and used for business-related purposes, the government argued "I'm still waiting to hear

how that relates to event planning or hotel booking." DE:92:59.

The government's closing was also rife with vouching, incorrect representations regarding the evidence, and reference to facts not in evidence. DE:92:56 (vouching in response to defense argument, saying "I don't think that's the case. I think what we saw was on his Wells Fargo Excel Booking account opening, he knows exactly what date that company was incorporated, and he put it right on there"); DE:92:57 (improperly vouching, telling jury, "you heard Agent Olson. You heard Mr. Burchfiel. It's very clear"); DE:92:58 (improperly vouching for evidence, telling jury, "this case is about numbers you can trust versus the numbers you can't"); DE:92:27 (vouching and telling the jury "we traced the dollars in that account into the withdrawals" and the "property was, in fact, proceeds of wire fraud").

The government introduced facts that were not in evidence, arguing that "you heard [defense counsel] say in his opening statement that you were going to see evidence of Super Bowl parties from Los Angeles, which by the way happened in 2023." DE 92:54. This reverse-vouching—that is, attempting to undermine defense credibility with facts not in evidence—was plainly improper. *Cf. United States v. Eyster*, 948 F.2d 1196, 1206–07 (11th Cir. 1991) (prohibition against vouching forbids arguing credibility based on . . . evidence not before the jury") (citation omitted). "[A] prosecutor may not seek to obtain a conviction by going beyond the evidence before the jury." *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) (internal

quotation marks omitted); *accord United States v. Epps*, 613 F.3d 1093, 1100 (11th Cir. 2010) (same); *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983) (same; characterizing closing argument limitation as a "fundamental principle"). It is clearly improper to "indicat[e] that information not presented to the jury supports the testimony," *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991), or, by the same token, rebuts it. *See id*. at 1207 (vouching for additional evidence "severely impairs the likelihood of a fair trial").

The government also placed undue focus on the citizenship issue and the immigration file, distorting the essential elements and the Indictment's allegations. DE:92:56 (misrepresenting the materiality of the citizenship issue by telling the jury, "these are all materialized" and then referencing date of establishment and citizenship as similarly material); DE:92:16 (describing SBA documents as "very serious" and suggesting that jury could convict based on mere inaccuracy because the "SBA, during a global pandemic, is relying on you to tell the truth"); DE:92:22-23 ("He believes that if he doesn't list any assets on this immigration filing, he'll be better off.).

And the government misrepresented the tax return issue, telling the jury that the Excel Booking tax return "was never submitted to the IRS," after admitting to the court it *was* submitted. DE:92:23. *See also* DE:92:58 ("Whether a tax record is filed or not, according to IRS files, unlike the defendant, does not lie. It is a fact of whether the document has been filed."); DE:92:60 (government falsely arguing that the IRS

44

records "show that Excel Booking never filed a 2019 tax return and then suddenly in the SBA file submitted by the defendant . . ."; district court overruling defense objection).

These repeated improper comments created a substantial probability that, but for the prosecutor's remarks, the outcome of the proceeding would be different.

**B.      Improper testimony from Case Agent Olson.**

Contributing to the cumulative error and the resulting prejudice, was the government's eliciting extensive improper testimony from its case agent contrary to Fed. R. Evid. 602, 701, and 702.  *See* DE:90:112 (asking case agent to provide expert testimony, without qualification, on party planning, "[b]ased on your training and experience, did you see regular yacht rentals that would be part of a party planning business"); *id.* ("in your training and experience, having two yacht rentals coming out of an account with this kind of activity, is that consistent with conducting an event planning business); *id*. (witness responding with impermissibly speculative testimony that "[i]t seems more personal, personal expenses"); DE:90:118 (asking witness "in your experience investigating financial fraud, have you become familiar with what—you know, what kind of activities you would see in a business account" and following up with "[a]re a couple of large transactions coming into an account consistent or inconsistent with vendor payments, payroll, events planning, or any other kind of business activity?").  *See also* DE:90:122 (government asking witness "how

45

would you characterize the large deposits that are suddenly coming into this account in 2021", and witness speculating in response that "it doesn't seem to be consistent" and "the debits going out seem to be more for personal use"); *id*. (government asking witness speculative question outside the scope of her knowledge, and asking her to testify as an expert in party-planning business, "[d]o you see a lot of deposits coming in that would be related to an event planning business"); DE:90:132 (witness offering speculative testimony that invades the province of the jury, testifying that the account "seemed to be for personal use"); *id*. (witness testifying that "[i]n my training and experience, I didn't see what was characterized as business activity"); DE:90:137-38 (government invading province of jury and asking witness to speculate, asking if she saw "anything in those accounts resembling consistent business activity of a mobile app developer or an event planning company of any kind").

The government repeatedly used its case agent to invade the province of the jury. *See* DE:88:125 (government asking case agent, "[b]ased on your investigation, were the defendant's statements, those statements, true or false" and witness answering "false"); DE:88:179 (government asking witness, "[b]ased on your knowledge of this case, is there a reason why the defendant would benefit by putting false dates of incorporation on his application," and district court overruling the objection). The government also vouched for and led the witness. *See* DE:90:115 (referencing defense counsel's cross-examination and telling witness, "And you

46

tended to give a consistent answer about that"). Further, the government elicited misleading answers regarding the validity of the tax returns submitted with the loan modification. DE:90:126.

The prejudice from the testimonial impropriety was substantial, especially because Agent Olson was the case agent who sat at counsel table for the entire trial. *See United States v. Hawkins*, 934 F.3d 1251, 1261 (11th Cir. 2019) (finding plain error where case agent's testimony mixed expert opinion with fact testimony, synthesized the trial evidence, and strayed into speculation and unfettered, wholesale interpretation of the evidence). It contributes to the cumulative error.

## C.     Absence of a Unanimity Instruction.

The absence of a unanimity instruction contributed to the cumulative error. The jury was permitted to convict on bases that were legally unfounded, including whether the number of employees affected the amount of the loans, and where there was no special verdict inquiry of the jury to ensure that they relied on a legally valid theory, as well as a theory supported by substantial evidence. The jury was asked to resolve the charges without finding unanimously what false statement they agree was made, what was material, or even if the same fraud scheme applied to their individual verdicts. The verdict form did not set forth which statement the jury convicted on. *Cf. United States v. Grow*, 977 F.3d 1310, 1330 (11th Cir. 2020) (given "general verdict on count one . . . we don't know whether the jury found [the defendant] guilty of

47

conspiracy to commit healthcare fraud, conspiracy to commit wire fraud, or both").

Similarly, without guidance as to unanimity on the ground for finding a false material statement, the jury was able to rely on uncharged statements.

## VI. The district court erred in calculating the sentencing guidelines.

Rene's sentencing guidelines were calculated by the district court at offense level 21 with criminal history category I, yielding a guideline range of 37–46 months. DE:122. The district court sentenced him at the bottom of that range. At sentencing, the district court, over Rene's objection, imposed a two-level obstruction-of-justice enhancement and a 14-level loss enhancement for an intended loss of more than $550,000. Although the district court suggested that some of the defense objections might not have changed the sentence imposed, DE:122:47–48 ("I will say that even had I granted some of the defense objections, I feel that a – the sentence that I am going to give is the sentence that I would have given because I think it is an appropriate sentence in this case."), the district court did not make a valid finding under *United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006), that the guidelines made no difference in the sentencing determination.

### A. Obstruction of justice enhancement.

The district court, over Rene's objection, imposed an obstruction of justice enhancement sought by the government. DE:122:53–54; *see also* DE:85,86,94 (government objection, response, and reply). The district court imposed the

enhancement even though Rene did not testify or seek to offer any false evidence, but sought merely to correctly counter the *government's* false claim that Rene had not submitted business tax returns for the loan applicant entities (even though he had paid the income taxes associated with such returns). The district court also failed to make any findings regarding the basis or theory for the imposition of the enhancement. After announcing the sentence, the district court first stated that the sentencing objections (one of which was the government's request for an enhancement) had all been denied. DE:122:52-53. The district court then stated that it was adopting the revised presentence report that included an obstruction enhancement. *Id.*

With or without explanation by the district court, there was no valid basis for the enhancement. The government used its last-minute interrogations of Rene's former tax preparer to claim that the preparer did not have a valid documentary record of his actions. This rendered the preparer an unreliable record custodian of his own tax filing business records, and Rene therefore did not call him. That in no way established any obstruction, but rather added more confusion to the record as to why, despite trying to file the returns and despite calculating the amount of income tax for those returns—tax that Rene timely paid—the preparer failed to properly file.

The tax preparer had told Rene that he had, as he was hired to do, *filed* Rene's business tax returns for 2019 and 2020. Rene received written confirmation from the tax preparer in early 2022 that the preparer had made the filings and Rene further was

made aware of the fact that the income tax bills for the businesses had been timely paid as indicated on the returns that the preparer told Rene he had filed in 2021. Evidence at trial showed that the preparer had begun submitting the returns to IRS, and that IRS had received at least one of them, but that the preparer had made an error in his characterization of one of the corporations' election to proceed as an S corporation, leading to rejection of the return by IRS. Rene, however, was never told of this error by the preparer. The government had, until late in the trial, denied that any attempted filing on behalf of Rene was ever made. Thus, defense counsel (with Rene on the telephone with him) called the preparer to confirm what the preparer years earlier had told Mr. Rene—that the returns had been filed.

The government's theory of obstruction was not merely entirely speculative as to both the preparer and Rene, but was also nonsensical. The tax payments occurred years before any knowledge of a criminal investigation. The attempted filing, which the government belatedly admitted at trial, also came years before any investigation. There was no contact between Rene and the preparer, other than Rene being on a telephone with defense counsel who simply asked the tax preparer to confirm sending an email in 2022 in which he sent Rene the tax returns that he claimed to have filed (with the tax calculations used to actually pay the income tax). There was no obstruction by Rene. There was no finding of obstruction made by the district court, much less an explanation of how there could have been obstruction. The government

simply caused a defense witness to acknowledge an undisputed fact—that in 2022 he emailed Rene copies of tax returns that the preparer claimed to have filed for Rene—to become unusable because his memory of his handling of the taxes was uncertain. The one fact the witness was being offered for was true: he represented to Rene that the returns corresponding to the tax he had paid had been filed. DE:87:17 (government discounts witness John Orphe: "He's not our witness, and ***we don't find him to be credible***.") (emphasis added); *id* ("[W]e got these documents a week ago and a few days ago, and immediately turned them over to Mr. Napoleon. We're giving him the records. If he doesn't have them, it's his witness. So we are doing the work for him. And so if there are inconsistencies in there, that goes to the credibility of his witness.")

The government precipitated the entire obstruction fiasco by claiming throughout the pretrial period, and then even after trial started, that the IRS had no record of the defendant's tax return for either of the relevant loan applicant businesses for the tax year 2019. *See* DE:89:9 (government asserts, on the third day of trial: "We learned this morning that he submitted one, and I made a disclosure immediately to the defense, so I just want to make that clear for the record. THE COURT: What do you mean, 'submitted'? What is the difference between submitted and filed?").

The government's incorrect version of the relevant record, which it maintained until the third day of trial began and two full days after the defense motion for continuance to address tax matters was denied—and continued to maintain in front of

the jury—had been useful to the government's case because it seemed to support the unfounded theory that despite incorporation of the relevant businesses pre-COVID in 2019, the defendant did no 365Live or Excel Booking business that year.

The absence of any tax filing was an unreliable premise that was undermined only after trial commenced. When the defendant's lawyer, on May 8, 2024, forwarded to the government what the defendant's former tax preparer had sent the defendant (i.e., tax returns) in an email more than *two years prior* (and long before any investigation), it was meant to confirm the defendant's belief that his tax preparer did send in 2019 returns. In response, the government sent a brace of federal agents to the *former* tax preparer (who had not worked with the defendant for more than a year) in order to dig up anything to undo the effect of the preparer's written statement two years earlier to the defendant confirming providing copies of the tax returns.

The tax preparer's only records were digital, and thus when printed to PDF bore the date they were printed, rather than the metadata date (which the government apparently never sought). The government used that fact as a basis to question the tax preparer further. As pressure mounted on the tax preparer to explain what went wrong—with both the government and the defense pressing him to explain why he had told the defendant the returns were filed when they seemingly were not—the tax preparer came up with new documents (apparently thinking he was covering himself). But the new documents—which contradicted everything the defendant had given

52

counsel and had given to SBA—were of no use at all for the defense, and were ultimately used to exclude highly relevant indicia of business activity. DE:90:81.

The defense attorney, faced with the contradictory new documents provided *to the government* by the tax preparer, urged the district court to grant a continuance to sort out what was going on. DE:87:16 (defense contends that the actions taken and documents produced by the tax preparer upon interacting with the government are unreliable and that the defense needed more time to investigate and prove it; district court advises that defense could "skewer" the tax preparer as a falsifying witness).

These record facts show unquestionably that what the government characterized as obstruction was, at the absolute worst, no more than "confusion, mistake, or faulty memory"—*by the tax preparer*. *United States v. Dunnigan*, 507 U.S. 87, 95 (1993) (Supreme Court emphasizes that matters that yield uncertainty and confusion are not suitable for an obstruction enhancement under the federal sentencing guidelines). It is clear from the record that the actions taken by the tax preparer were anathema to the defense, not something the defense sought or "caused." Pointing this up, the government successfully opposed any defense-requested continuance even though the government had still not revealed that its own tax evidence—the erroneous claim that there had been no tax submission of any kind for either business at issue—was inaccurate and incomplete. The district court therefore erred in imposing the obstruction enhancement.

**B.      Loss calculation**.

The district court erred in overruling Rene's objections to a loss calculation that far exceeded any theory of actual loss, rested on speculation as to Rene's likelihood of loan repayment, and constituted a form of intended-loss reliance that does not apply to sentencings prior to November 1, 2024.  The sentencing guidelines applicable to Rene's September 2024 sentencing did not define loss to include circumstances where there was no actual loss.  Although the guideline commentary contained language that would expand the guideline term, "loss," to include non-loss situations, the use of such an incompatible commentary to amend the guideline is barred under *Kisor v. Wilkie*, 588 U.S. 558 (2019), and its progeny.  Nor did Mr. Rene actually intend any loss to occur within the meaning of the commentary.  And, in light of Rene's repayment of the loans, there was no actual loss.  Finally, the loan transactions did not contemplate default—Rene  remained solvent and willing to repay the loans, which he did prior to sentencing.  He thus did not actually intend any loss to occur, and any finding of actual loss was incorrect.

## CONCLUSION

For the foregoing reasons, the Court should vacate Guerby Rene's convictions and sentence and remand for further proceedings.

Respectfully submitted,

 s/ Richard C. Klugh
RICHARD C. KLUGH, ESQ.
Attorney for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Telephone No. (305) 536-1191
Facsimile No. (305) 536-2170

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the countable pages of this brief contain 12,887 words.

 s/ Richard C. Klugh
Richard C. Klugh

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of March, 2025, the foregoing was filed electronically and thereby served upon counsel for the Appellee, Assistant United States Attorney Daniel Matzkin, 99 N.E. 4th Street, Miami, Florida 33132.

 s/ Richard C. Klugh
Richard C. Klugh